**STATE OF LOUISIANA**

**Twenty Second Judicial District Court for the PARISH OF ST. TAMMANY**

**TYLER M. ROACH, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana**

2018-10930 A

FILED

FEB 26 2018

MELISSA R. HENRY - CLERK

DEPUTY TRACEY GRAHAM

**Petitioner,**

**VS.**

**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC;**
**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,**
**FAMILY DRUG MART LLC.**

**Defendants.**

**Petition for Redhibitory Vices, Louisiana Products Liability, Louisiana Civil Code art. 2315 (B), Louisiana Civil Code art. 1953, Medical Monitoring, Class Action as per Code of Civil Procedure art. 591, Louisiana Racketeering Act, with Jury Demand**

Comes now, through undersigned counsel, the Petitioner minor child K.E.R., appearing through his natural tutor Tyler M. Roach, and on behalf of all other Louisiana children situated like K.E.R. born in Louisiana with a Neonatal Abstinence Syndrome ('NAS") diagnosis because their mothers were sold, purchased, and consumed opioids in Louisiana during gestation and seek damages, medical monitoring, attorney fees, injunctive relief and all other relief appropriate under the premises.

Exhibit 1

**Introduction regarding the Louisiana Civil Code**

1. The Louisiana Civil Code has been called the most perfect child of the civil law. It has been praised as "the clearest, the most philosophical, and the best adapted to the exigencies of modern society." It has been characterized as "perhaps the best of all modern codes throughout the world." Based on Roman law, modeled after the great Code Napoleon, enriched with the experiences of at least 27 centuries, and mellowed by American principles and traditions, it is a living and durable monument to those who created it. After 200 years of trial, the Civil Code of Louisiana remains venerable, a body of substantive law.

2. The passage of an act by the Legislature of the Territory of Orleans, approved on March 31, 1808, promulgating a compilation of laws, is now commonly referred to as the Civil Code of 1808. Civil government began in Louisiana in 1712. The French laws governed from that date until 1769, when Gov. O'Reiley abolished those laws and established in their stead the Spanish law. The United States took formal possession of the province of Louisiana on December 20, 1803, about eight months after the Louisiana Purchase had been concluded. France had assumed sovereignty for a period of only 20 days prior to that date, during which time nothing was done to repeal the Spanish laws or to establish the laws of France, so at the time the United States assumed sovereignty the laws of Spain were still in force.

3. The first official act performed by William C. C. Claiborne, one of the two commissioners appointed by the president to take possession of this province, was to provide for the retention of the "laws heretofore in force," which of course were the Spanish laws. The population of Louisiana at that time was estimated by Claiborne to be about 72,000, one-half of whom were slaves. The City of New Orleans had a population of only 10,000. A great majority of the white inhabitants were of French descent, and a substantial portion of the remainder were Spanish.

4. The formal delivery of Louisiana to the United States had not been completed, however, before a host of emigrants, both American and foreign born, flocked to New Orleans—intent on making a fortune. Among them were a number of lawyers, most of whom were of common law origin, and many of whom were ignorant of the language of the people among whom they had settled. Fortunately for the future of the state, however, the lawyers who were located there during these early years, whether emigrant or native born, with few exceptions, were men of remarkable ability. But, even these able lawyers and the newly-appointed judges

could not properly interpret and apply the complex and conflicting Spanish law. The need for some immediate clarification of the laws which governed Louisiana was urgent.

5. Many inhabitants of Louisiana, already displeased over the arbitrary powers conferred by Congress on the president and his appointees in the territory, became alarmed when they learned that the newly-appointed American officials intended to institute the common law system. Their experience with Spanish judicial proceedings had left them with little or no respect for the courts, and they were afraid of the common law system where the decisions of the courts became law, and where they would be required to search through English jurisprudence to determine what laws applied. They preferred to continue to be governed by the laws of Spain, with which they were familiar, where all enforceable laws were required to have some statutory origin, and where the decisions of the courts did not assume the status of laws, but were considered merely as judicial interpretations of statutory provisions.

6. There is little question but that the common law system would have been established here shortly after the United States assumed sovereignty, and that Louisiana would be a common law state today, were it not for the fact that Edward Livingston, a New York lawyer who emigrated to Louisiana in 1803, emerged as a leader in opposing this action, and as a champion for the cause of retaining a civil law system in the territory.

7. The Legislative Council was convened on December 5, 1804. At its first meeting this council appointed three of its members as a committee to prepare a Civil Code and a Criminal Code, and "to employ two counselors-at-law to assist them in drafting the said codes." In 1806, the first Legislature of the Territory of Orleans convened and, apparently siding with Livingston, promptly adopted an act providing that the Territory of Orleans should be governed by the Roman and Spanish laws which were in effect at the time of the Louisiana Purchase."

8. The official title given to the code of laws which was adopted in 1808 was "Digest of the Civil Laws now in Force in the Territory of Orleans, with Alterations and Amendments Adapted to its Present System of Government." Although these compilers described their work as a digest of the laws then in force, it actually was a complete civil code, divided into three books, each of which was broken down into titles, chapters and articles, similar to our present code, except that in numbering the articles a new series of numbers was used in each title.

9. The Civil Code prepared by Brown and Moreau Lislet, however, was not based

on the Spanish law, as the legislature had directed, but it was based instead on the then newly adopted French Code, the Code Napoleon. No satisfactory explanation has been offered to this date as to why this was done. It is probable, however, that these two attorneys and the legislature had a high regard for the codification experience in France, not only as to form but also as to content, since both the French and the Spanish systems had many common sources in Roman law, and for that reason they may have used the Code Napoleon as a model without any intent to displace the Spanish law. This theory is supported by the fact that there are many differences between the Code Napoleon and the Louisiana Code of 1808, due largely to the fact that there were incorporated into the Louisiana Code a substantial number of Spanish laws, which had not been included in the French Code. The Louisiana Code contained 2127 articles, a little less than the number contained in the Code Napoleon.

10. Regardless of the French sources used by the redactors, the primary significance of the adoption of the Civil Code of 1808, of course, was that it constituted the formal recognition and establishment of the civil law, and not the common law, for the Territory. This project also was prepared originally in the French language, and was then translated with some inaccuracies into English. The French text was printed in one volume and the English translation was printed separately in another.

11. Although there seems to have been no act passed by the legislature for the express purpose of adopting this civil code, the legislature did authorize the printing and promulgation of the code, as amended, by act approved on April 12, 1824. The act pro- vided that the text should be printed in English and French on opposite pages. The title of this completed code, as promulgated, is "Civil Code of the State of Louisiana." Included in it were provisions originating from Spanish law which were not contained in the Code of 1808. It also contained some provisions from territorial statutes, and others from common law sources. There were a total of 3,522 articles, in this code, more than one and one-half times as many as were contained in the Code of 1808.

12. The fact that the Louisiana Civil Code has been revised three times during the past 200 years, does not indicate a weakness in that work, but, on the contrary, it evidences an orderly evolution of the law. In the course of time consolidated statements of law in a civil code become overgrown with additional data in amendments and other statutes on the subject matter. Also, new inventions and discoveries present problems which are difficult to settle by reference

to older rules or principles. So it is necessary from time to time that such a code be re-examined and perhaps revised or re-written in order to incorporate all of these changes and to keep it virile and up-to-date.

13. The Louisiana Civil Code is not simply an adaptation of the Code Napoleon. Neither is it a "digest" of the Spanish laws which were in force in 1808, as the title of the code adopted during that year seems to indicate. It includes many provisions having a basis in common law, but the common law system does not prevail in this state—despite arguments advanced by some to the contrary. The simple truth of the matter is that Louisiana has developed a legal system of its own. The affection which lawyers throughout this state have for the Louisiana Civil Code now is no less than that which Napoleon expressed for the code of laws which bears his name, when he wrote: "What nothing will destroy, what will live eternally, is my Civil Code."[1]

14. Recently, the code was translated back into French. The LSU Center of Civil Law Studies team completed the French translation of our Louisiana Civil Code, now fully available in English and in French online: http://www.law.lsu.edu/clo/louisiana-civil-code-online/.

15. They close relationship of Louisiana to France and the tricentennial of the City of New Orleans are being recognized by a "twinning" between the Supreme Court of Louisiana and the Supreme Court France, Cour de Cassation. Here is a bi-lingual excerpt from the document Déclaration de jumelage des juridictions suprêmes de France et de Louisiane:

a. Thirty years after the Twinning of France's Court of Cassation with Canada's Supreme Court on February 26, 1998, the Francophone Section of the Louisiana Bar Association has proposed a similar « Twinning » of the highest Court of France with that of Louisiana. Such a Twinning will provide a formal vehicle for the study, discussion and promotion of shared civilian legal traditions both as they are understood in France and how they have developed in Louisiana.

b. Trente ans après le jumelage de la Cour de Cassation française avec la Cour Suprême du Canada, signé le 26 février 1998, la section francophone du barreau de Louisiane a proposé un jumelage identique à la Haute Juridiction française avec la Cour Suprême de Louisiane. Un tel jumelage constituera un vecteur d'échanges pour l'étude, l'analyse et la promotion des traditions de

[1] Jon T. Hood Jr., *The History and Development of the Louisiana Civil Code*, 50 La. Law Review 18 (1958).

droit civil communes à ces deux entités, tant concernant leur interprétation que leur développement en France et en Louisiane.

c. Our Twinning with France welcomes Louisiana into other Twinning relationships between the Court of Cassation and the highest courts of Francophone and other Civil Law jurisdictions, thus establishing opportunities by which to build relationships between Louisiana lawyers, judges and their counterparts.

d. Ce jumelage incitera dans le même temps la Louisiane à proposer d'autres jumelages avec les différentes Cours Suprêmes francophones et de droit civil, créant ainsi des opportunitésd'établir des relations entre les avocats et juges de notre Etat et leurs homologues.

e. Our formal relationship with the Court of Cassation will also underscore Louisiana's commitment to assist in improving the rule of law as exemplified by the Universal Declaration of Human Rights adopted by the United Nations General Assembly at its 3rd session on December10, 1948 as Resolution 217 at the Palais de Chaillot in Paris, France.

f. Cette relation formelle avec la Cour de Cassation française soulignera égalementl'engagement de la Louisiane à contribuer à l'amélioration du droit, illustrée par l'adoption de la Déclaration Universelle des Droits de l'Homme par l'Assemblée Générale des Nations Unies au sein de la résolution 2017, lors de sa troisième session du 10 décembre 1948 tenue au Palais de Chaillot à Paris.

g. Our "Twinning" relationship will encourage the joint study, support, and publication of authoritative legal writings, recommendations regarding areas of interest concerning French law, heritage, and culture, improve liaison with the Louisiana State Bar Association, the American Bar Association, the Bar of Paris and other Bars and Civil Law associations of France, the academic community, and the public at large to achieve these purposes. Dialogue between Francophone Section and sections of the Louisiana Bar Association and the various bar associations of France will thus be fostered and encouraged.

h. Ce jumelage stimulera l'étude commune et la publication d'avis et de recommandations sur des sujets relatifs à l'héritage, au patrimoine et à la culture issus de la loi française etl'amélioration de la communication entre les barreaux de Louisiane, de Paris, l'American Bar Association, les différents barreaux français, les associations françaises et louisianaises de droit civil, les institutions académiques et le grand public en général afin d'atteindre leurs objectifscommuns et respectifs. Le dialogue entre la Section Francophone et les autres sections du barreau de Louisiane, ainsi qu'avec les barreaux français sera ainsi encouragé.

i. Louisiana's twinning with the Court of Cassation will afford sponsorship opportunities for regularly-scheduled continuing legal education seminars in Louisiana, France and other Francophone venues. Especially important is the Judge Allen M. Babineaux Civil Law Symposium and its mission to promote the civilian traditions of Louisiana law that date from the founding of Louisiana, through Louisiana's Cession to the United States, the Louisiana Civil Codes of 1808, 1825, and 1870, and the revision and updating of its Civil Code and the recent publication of the revised Civil Code in multiple languages.

j. Le jumelage de ces deux Hautes Juridictions permettra le parrainage et l'organisation de séminaires de formation juridique réguliers en Louisiane, en France et dans d'autres lieux francophones, tel que le Symposium "Juge Allen M. Babineaux" de droit civil qui a pour objectifde promouvoir les traditions civilistes du droit louisianais présentes depuis les origines de la Louisiane, à travers la cession de la Louisiane aux Etats-Unis, les Codes civils de Louisiane de 1808, 1825 et 1870, leurs révision et mises à jours, ainsi que la publication récente du Code civil louisianais en plusieurs langues.

k. Another goal of the mutual cooperation signified by this twinning that is being seriously considered is reciprocal admission of lawyers in Louisiana, France, and other Francophone jurisdictions. To this end, students and lawyers are being given opportunities to work and learn in various courts and law firms in Louisiana and elsewhere. Bâtonniers and members of the Francophone bar

associations are being invited to participate in judicial and bar conferences and gatherings. Plans are being made for members of French legal community to join with their Louisiana counterparts in celebrating the 300th anniversary of the founding of New Orleans.

l. Un autre objectif de coopération mutuelle que ce jumelage laisse sérieusement envisagerest l'admission réciproque des avocats des barreaux de Louisiane, de France et plus largement des barreaux francophones. Pour ce faire, étudiants et avocats se verront offrir l'opportunité de travailler et d'étudier au sein de plusieurs juridictions et cabinets d'avocats en Louisiane et ailleurs. Les bâtonniers et membres des associations des barreaux francophones seront invités à participer à des conférences et rassemblements entre barreaux. Nous travaillons actuellement afin de permettre aux membres de la communauté juridique française de se joindre à leurs pairs en Louisiane à l'occasion de la célébration du Tricentenaire de la Nouvelle-Orléans.

m. The Twinning will be celebrated in Paris on June 6-10, 2018 at the same time as the American Bar Association is celebrating the 70th anniversary of the Universal Declaration of Human Rights.

16. Made defendants herein are:

a. McKesson Corporation ("McKesson" or "Distributor Defendant") has its principal place of business in San Francisco, California and is incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the state of Louisiana.

b. Cardinal Health, Inc. ("Cardinal") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the state of Louisiana.

c. AmerisourceBergen Corporation has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of

prescription opioids to providers and retailers in the state of Louisiana.

i. McKesson, Cardinal, and AmerisourceBergen are collectively referred to hereinafter as "Distributor Defendants."

d. Family Drug Mart LLC ("Family Drug Mart" or "Pharmacy Defendant") is a limited liability corporation with its principal place of business in Mandeville, Louisiana. Petitioner's mother purchased opioids at Family Drug Mart in Slidell, Louisiana. Upon information and belief, Family Drug mart is not a qualified health care provider.

e. Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware. Purdue Pharma, Inc. is a New York corporation with its principal place of business in Stamford, Connecticut, and The Purdue Frederick Company is a Delaware corporation with its principal place of business in Stamford, Connecticut (collectively, "Purdue"). Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the U.S. and Louisiana. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

f. Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Louisiana. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

g. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly- owned subsidiary of

Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

h. Teva Ltd., Teva USA, and Cephalon collaborate to market and sell Cephalon products in the U.S. Teva Ltd. conducts all sales and marketing activities for Cephalon in the U.S. through Teva USA. Teva Ltd. and Teva USA publicize Actiq and Fentora as Teva products. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in Louisiana, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed in Louisiana, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own. Through interrelated operations like these, Teva Ltd. operates in Louisiana and the rest of the U.S. through its subsidiaries Cephalon and Teva USA. The U.S. is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (Teva Ltd., Teva USA, and Cephalon, Inc. are hereinafter collectively referred to as "Cephalon.")

i. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville,

New Jersey. Janssen Pharmaceutica Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "Janssen."). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Louisiana, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

j. Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "Endo.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Louisiana. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Louisiana, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

k. Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan

PLC in January 2013. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan PLC, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan PLC exercises control over and derives financial benefit from the marketing, sales, and profits of Allergan/Actavis products. (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. hereinafter are referred to collectively as "Actavis.") Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the U.S. and Louisiana. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

i. Purdue, Cephalon, Janssen, Endo, and Actavis are collectively referred to hereinafter as the "Pharmaceutical Defendants."

who are liable unto Petitioners because:

17. K.E.R.'s mother was injured in a car accident and was prescribed opioid pain killers as part of her treatment. She soon became addicted to the opioids she was prescribed.

18. K.E.R.'s mother became pregnant with K.E.R. while addicted to opioids. K.E.R. was exposed in utero to the opioids his mother took during her pregnancy.

19. At birth, K.E.R was diagnosed with Neonatal Abstinence Syndrome ("NAS"), a condition suffered by babies of mothers addicted to opioids. K.E.R. was forced to endure a

painful start to his life; crying excessively, arching his back, refusing to feed, and shaking. NAS is a clinical diagnosis, and a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy. K.E.R. spent his first days in the Neonatal Intensive Care Unit writhing in agony as he went through detoxification.

20. K.E.R.'s mother purchased and consumed her prescription opioids from Defendant Family Drug Mart LLC.

21. Upon information and belief, Distribution Defendants, vendors with knowledge of all redhibitory vices, sold all prescription opioids sold to and consumed by K.E.R.'s mother.

22. Upon information and belief, the opioids purchased and consumed by K.E.R.'s mother were manufactured by Pharmaceutical Defendants Purdue, Cephalon, Janssen, Endo, and Actavis, who are presumed pursuant by La. Civil Code arts. 2520 through 2545 to know of the redhibitory vices which were not declared at the time of the sale.

23. The vice at issue, its true addictive qualities, rendered the opioid useless and so inconvenient that it is presumed that a Louisiana healthcare provider would not have prescribed it and a mother of childbearing age or pregnant would not have purchased and ingested it.

24. K.E.R.'s experience is part of an opioid epidemic sweeping through the United States, including Louisiana, that has caused thousands of infants great suffering and continuing developmental issues. This epidemic is the largest health care crisis in U.S. history. K.E.R. brings this class action to eliminate the hazard to public health and safety caused by the opioid epidemic and to abate the nuisance caused by Defendants' false, deceptive and unfair marketing and/or unlawful diversion of prescription opioids. Petitioners further seek the equitable relief of medical monitoring to provide this class of infants the monitoring of developmental issues that will almost inevitably appear as they grow older and equitable relief in the form of funding for services and treatment.

25. The incidence of NAS has been increasing in the United States. The Substance Abuse Mental Health Services Administration reported that 1.1% of pregnant women abused opioids (0.9% used opioid pain relievers and 0.2% used heroin) in 2011.

26. In recent years, there has been a dramatic rise in the proportion of infants who have been exposed to opioids. Opioid use among women who gave birth increased in the United States from 1.19 to 5.63 per 1,000 hospital births per year between 2000 and 2009. Concurrently the incidence of neonatal abstinence syndrome (NAS) among newborns during the same period

(from 1.20 per 1,000 hospital births per year in 2000 to 3.39 per 1,000 hospital births per year in 2009).

27. In a study from Florida, the number of newborns who had NAS and were admitted to the NICU increased by 10-fold from 2005 to 2011. Increases in the incidence of NAS have been reported uniformly across community hospitals, teaching hospitals, and children's hospitals.

28. The incidence of NAS in newborns born to opioid-dependent women is between 70 and 95 percent. Research suggests that newborns with NAS (most commonly associated of opioid misuse during pregnancy) are more likely than all other hospital births to have low birthweight or respiratory complications. Untreated heroin and other opioid misuse during pregnancy is also associated with increased risk of placental abruption, preterm labor, maternal obstetric complications, and fetal death.

29. The health care resources of Louisiana are inadequate to deal with the rapidly growing scale of the Crisis. The 2012 National Survey of Substance Abuse Treatment Services data indicate that 13 percent of outpatient-only substance use treatment facilities and 13 percent of residential treatment facilities offered special programs for pregnant/postpartum women; within hospital inpatient treatment facilities, 7 percent offered special programs for pregnant/postpartum women.

30. The NAS epidemic and its consequences could have been, and should have been, prevented by the Defendants who control the U.S. drug distribution industry and the Defendants who manufacture the prescription opioids. These Defendants have profited greatly by allowing Louisiana to become flooded with prescription opioids.

31. The drug distribution industry, including Pharmaceutical, Distributor and the Pharmacy Defendants, have an obligation to serve as a "check" in the opioid delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in their obligation, instead consciously ignoring known or knowable problems and data in their supply chains. McKesson breached this statutory obligation by ignoring known or knowable problems and data and their supply chains.

32. Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who

became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

33. Defendants' wrongful conduct has allowed millions of opioid pills to be diverted from legitimate channels of distribution into the illicit black market in quantities that have fueled the opioid epidemic in Louisiana. This is characterized as "opioid diversion." Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, unknowing patients and unauthorized opioid users have ready access to illicit sources of diverted opioids.

34. For years, Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including the dramatic increase in the number of infants born with NAS. All the Defendants in this action share responsibility for perpetuating the epidemic and the exponential increase in the number of infants afflicted with NAS.

35. Defendants have foreseeably caused damages to K.E.R. and Class Members including the costs of neo-natal medical care, additional therapeutic, prescription drug purchases and other treatments for NAS afflicted newborns, and counseling and rehabilitation services after birth and into the future. Petitioner K.E.R. brings this civil action for injunctive relief, compensatory damages, statutory damages, and any other relief allowed by law against the Defendant opioid drug distributors, retailers, and manufacturers that, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably injured, and continues to injure, K.E.R. and the Class.

36. Petitioner K.E.R. and Class Members directly and foreseeably sustained all damages alleged herein. Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing treatment of infants born with opioid-related medical conditions like NAS; (2) costs for providing ongoing medical care, additional therapeutic and prescription drug purchases, and other treatments; (3) costs for providing treatment, counseling and rehabilitation services; and (4) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including foster care services.

37. The Petitioner and the class have suffered and continue to suffer these damages directly. Petitioner also seeks the means to abate the epidemic Defendants' wrongful and/or unlawful conduct has created.

## JURISDICTION AND VENUE

38. Defendants have engaged in conduct and activities over a long time, systematically, individually and *in solido*, in the state of Louisiana that have caused all of the Petitioner's damages and all of which form the bases of the causes of action in this Petition as against Defendants. Defendants have committed multiple torts and breaches within the state of Louisiana, repeatedly and systematically.

39. Venue is proper in St. Tammany Parish pursuant to the Louisiana Code of Civil Procedure Art. 42, the Louisiana Code of Civil Procedure Art. 73, and the Louisiana Code of Civil Procedure Art. 74.

## BACKGROUND FACTS

40. Opioid means "opium - like" and the term includes all drugs derived in whole or in part from the opium poppy.

41. The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose, and death."

42. Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act. They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), or fully synthetic derivatives (such as fentanyl and methadone).

43. Before the epidemic of Defendants' prescription opioids, the generally accepted standard of medical practice was that opioids should only be used short-term for acute pain and few other very limited uses. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

## PHARMACEUTICAL DEFENDANTS' WRONGFUL CONDUCT

44. To establish and exploit the lucrative market of chronic pain patients, each Pharmaceutical Defendant developed a well-funded, sophisticated, and deceptive marketing and/or distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other Defendants and opioid manufacturers. These statements were unsupported by and contrary to the scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations, including those in Louisiana.

45. The Pharmaceutical Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Louisiana. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false and deceptive statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of Louisiana.

46. The Pharmaceutical Defendants' direct and branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Purdue ran a series of ads, called "Pain Vignettes," for OxyContin that featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. While Endo and Purdue agreed in 2015-16 to stop these particularly misleading representations in New York, they continued to disseminate them in Louisiana.

47. The Pharmaceutical Defendants also promoted the use of opioids for chronic pain through "detailers" – sophisticated and specially trained sales representatives who visited individual doctors and medical staff, and fomented small-group speaker programs. In 2014, for instance, these Defendants spent almost $200 million on detailing branded opioids to doctors.

48. The FDA has cited at least one of these Defendants for deceptive promotions by its detailers and direct-to-physician marketing. In 2010 an FDA-mandated "Dear Doctor" letter

required Actavis to inform doctors that "Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

49. The Pharmaceutical Defendants invited doctors to participate, for payment and other remuneration, on and in speakers' bureaus and programs paid for by these Defendants. These speaker programs were designed to provide incentives for doctors to prescribe opioids, including recognition and compensation for being selected as speakers. These speakers give the false impression that they are providing unbiased and medically accurate presentations when they are, in fact, presenting a script prepared by these Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

50. The Pharmaceutical Defendants' detailing to doctors was highly effective in the national proliferation of prescription opioids. Defendants used sophisticated data mining and intelligence to track and understand the rates of initial prescribing and renewal by individual doctors, allowing specific and individual targeting, customizing, and monitoring of their marketing.

51. The Pharmaceutical Defendants have had unified marketing plans and strategies from state to state, including Louisiana. This unified approach ensures that Defendants' messages were and are consistent and effective across all their marketing efforts.

52. The Pharmaceutical Defendants deceptively marketed opioids in Louisiana through unbranded advertising that promoted opioid use generally, yet silent as to a specific opioid. This advertising was ostensibly created and disseminated by independent third parties, but funded, directed, coordinated, edited, and distributed, in part or whole, by these Defendants and their public relations firms and agents.

53. The Pharmaceutical Defendants used putative third-party, unbranded advertising to avoid regulatory scrutiny as such advertising is not submitted to or reviewed by the FDA. These Defendants used third-party, unbranded advertising to create the false appearance that the deceptive messages came from an independent and objective source.

54. The Pharmaceutical Defendants' deceptive unbranded marketing also

contradicted their branded materials reviewed by the FDA.

55. The Pharmaceutical Defendants marketed opioids through a small circle of doctors who were vetted, selected, funded, and promoted by these Defendants because their public positions supported the use of prescription opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." These Defendants paid KOLs to serve in a number of doctor-facing and public-facing capacities, all designed to promote a pro-opioid message and to promote the opioid industry pipeline, from manufacture to distribution to retail.

56. These Defendants entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

57. The Pharmaceutical Defendants collaborated, through the aforementioned organizations and groups, to spread deceptive messages about the risks and benefits of long-term opioid therapy.

58. To convince doctors and patients in Louisiana that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, these Defendants made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

59. To convince doctors and patients that opioids are safe, the Pharmaceutical Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to

sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

60. The Pharmaceutical Defendants falsely claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some examples of these false and deceptive claims by opioid manufacturers are: (a) Actavis employed a patient education brochure that falsely claimed opioid addiction is "less likely if you have never had an addiction problem"; (b) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain, falsely claiming that addiction is rare and limited to extreme cases of unauthorized doses; (c) Endo sponsored a website, Painknowledge.com, which falsely claimed that "[p]eople who take opioids as prescribed usually do not become addicted"; (d) Endo distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "most people do not develop an addiction problem"; (e) Janssen distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults which described as "myth" the claim that opioids are addictive; (f) a Janssen website falsely claimed that concerns about opioid addiction are "overestimated"; (g) Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management – that falsely claims that pain is undertreated due to "misconceptions about opioid addiction."

61. These claims are contrary to longstanding scientific evidence, as the FDA and CDC have conclusively declared. As noted in the 2016 CDC Guideline endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

62. The FDA further exposed the falsity of the Pharmaceutical Defendants' claims about the low risk of addiction when it announced changes to the labels for certain opioids in 2013 and for other opioids in 2016. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." According to the FDA, because of the "known serious risks" associated with long-term opioid

use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

63. The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State of New York found no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This agreement, however, did not extend to Louisiana.

64. The Pharmaceutical Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudo-addiction" – a term used by Dr. David Haddox, who went to work for Purdue, and Dr. Russell Portenoy, a KOL for Cephalon, Endo, Janssen, and Purdue. Defendants falsely claimed that pseudo-addiction was substantiated by scientific evidence. Some examples of these deceptive claims are: (a) Cephalon and Purdue sponsored Responsible Opioid Prescribing, which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudo-addiction, rather than true addiction; (b) Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated"; (c) Endo sponsored a National Initiative on Pain Control (NIPC) CME program titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain; (d) Purdue sponsored a deceptive CME program entitled Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse in which a narrator notes that because of pseudo-addiction, a

doctor should not assume the patient is addicted.

65. The 2016 CDC Guideline rejects the concept of pseudo-addiction, explaining that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer- term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

66. The Pharmaceutical Defendants falsely instructed doctors and patients that addiction risk screening tools, patient agreements, urine drug screens, and similar strategies were very effective to identify and safely prescribe opioids to even those patients predisposed to addiction. These misrepresentations were reckless because Pharmaceutical Defendants directed them to general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Pharmaceutical Defendants' misrepresentations were intended to make doctors more comfortable in prescribing opioids. Some examples of these deceptive claims are: (a) an Endo supplement in the Journal of Family Practice emphasized the effectiveness of screening tools to avoid addictions; (b) Purdue's webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths"; (c) Purdue represented in scientific conferences that "bad apple" patients – and not opioids – were the source of the addiction crisis, when in fact the "bad apples" were the Defendants.

67. The 2016 CDC Guideline exposes the falsity of these misrepresentations, noting that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse – "for improving outcomes related to overdose, addiction, abuse, or misuse." The Guideline emphasizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

68. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Pharmaceutical Defendants falsely claimed that opioid dependence can easily be solved by tapering, that opioid withdrawal was not difficult, and that there were no problems in stopping opioids after long-term use.

69. A CME sponsored by Endo, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms could be avoided by tapering a patient's opioid dose by up to 20% for a few days. Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, that claimed "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," without mentioning any known or foreseeable issues.

70. Pharmaceutical Defendants deceptively minimized the significant symptoms of opioid withdrawal – which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use. The 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

71. The Pharmaceutical Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences, and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example: (a) an Actavis patient brochure stated - "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction"; (b) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People

Living with Pain, claiming that some patients need larger doses of opioids, with "no ceiling dose" for appropriate treatment of severe, chronic pain; (c) an Endo website, painknowledge.com, claimed that opioid dosages may be increased until "you are on the right dose of medication for your pain"; (d) an Endo pamphlet Understanding Your Pain: Taking Oral Opioid Analgesics, stated "The dose can be increased. . . . You won't 'run out' of pain relief"; (e) a Janssen patient education guide Finding Relief: Pain Management for Older Adults listed dosage limitations as "disadvantages" of other pain medicines yet omitted any discussion of risks of increased opioid dosages; (f) Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will; (g) Purdue's A Policymaker's Guide to Understanding Pain & Its Management stated that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages; (h) a Purdue CME entitled Overview of Management Options taught that NSAIDs and other drugs, but not opioids, were unsafe at high dosages; (i) Purdue presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdose.

72. These and other representations conflict with the scientific evidence, as confirmed by the FDA and CDC. As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages." That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

73. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

74. Pharmaceutical Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids created false impressions that these opioids can curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that

they believed abuse-deterrent formulations are inherently less addictive.

75. Pharmaceutical Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter abuse. For example, Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. The FDA warned in a 2013 letter that there was no evidence Endo's design "would provide a reduction in oral, intranasal or intravenous abuse." Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

76. In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. Similarly, the 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."

77. These numerous, longstanding misrepresentations minimizing the risks of long-term opioid use persuaded doctors and patients to discount or ignore the true risks. Pharmaceutical Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have Defendants failed to correct these false and deceptive claims, they continue to make them today.

78. For example, the Pharmaceutical Defendants falsely claimed that long-term

opioid use improved patients' function and quality of life, including the following misrepresentations: (a) an Actavis advertisement claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives; (b) an Endo advertisement that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, portraying seemingly healthy, unimpaired persons; (c) a Janssen patient education guide Finding Relief: Pain Management for Older Adults stated as "a fact" that "opioids may make it easier for people to live normally" such as sleeping peacefully, working, recreation, sex, walking, and climbing stairs; (d) Purdue advertisements of OxyContin entitled "Pain vignettes" implied that OxyContin improves patients' function; (e) Responsible Opioid Prescribing, by Cephalon, Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function; (f) Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain counseling patients that opioids "give [pain patients] a quality of life we deserve"; (g) Endo's NIPC website painknowledge.com claimed that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse"; (h) Endo CMEs titled Persistent Pain in the Older Patient claimed that chronic opioid therapy had been "shown to reduce pain and improve depressive symptoms and cognitive functioning"; (i) Janssen sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function"; (j) Purdue's A Policymaker's Guide to Understanding Pain & Its Management claimed that "multiple clinical studies" had shown opioids as effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients; (k) Purdue's, Cephalon's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

79. These claims find no support in the scientific literature. The 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."
- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

80. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

81. The 2016 CDC Guideline was not the first time a federal agency repudiated the Pharmaceutical Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

82. The Pharmaceutical Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." The 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

83. In addition, Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all relevant times. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10

hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

84. Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives continue to tell doctors that OxyContin lasts a full 12 hours.

85. Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse – which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

86. Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example: (a) Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009.

The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain; (b) Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain; and (c) in December 2011, Cephalon widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)*" to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News* – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

87. Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

88. Purdue unlawfully and unfairly failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years. Purdue's sales representatives have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs. Rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin – the same OxyContin that Purdue had promoted as less addictive – in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the *Los Angeles Times*, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action – even where Purdue employees personally witnessed the diversion of its drugs. The same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

89. The State of New York's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions of such prolific prescribers.

90. Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

91. As a part of their deceptive marketing scheme, the Pharmaceutical Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S and Louisiana. For example, these Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Defendants' misrepresentations.

92. The Pharmaceutical Defendants also targeted vulnerable patient populations like the elderly and veterens, who tend to suffer from chronic pain. These Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

93. The Pharmaceutical Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and deceptive. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The FDA and other regulators warned these Defendants of this, and these Defendants had access to scientific studies, detailed prescription data, and reports of adverse events,

including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of Defendants' misrepresentations, and Endo and Purdue have recently entered agreements prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

94. Moreover, at all times relevant to this Complaint, the Pharmaceutical Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Pharmaceutical Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

95. The Pharmaceutical Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Pharmaceutical Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

96. Finally, the Pharmaceutical Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions.

97. Thus, the Pharmaceutical Defendants successfully concealed from the medical community, municipalities, patients, and health care payers facts sufficient to arouse suspicion of the claims that the Petitioners now assert. Petitioners did not know of the existence or scope of

Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

98. The Pharmaceutical Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive.

99. The Pharmaceutical Defendants' deceptive marketing scheme caused and continues to cause doctors in Louisiana to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' deceptive marketing scheme also caused and continues to cause patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent these Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

100. The Pharmaceutical Defendants' deceptive marketing has caused and continues to cause the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

101. The escalating number of opioid prescriptions written by doctors who were deceived by the Pharmaceutical Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Louisiana. In August 2016, the U.S. Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."

102. Scientific evidence demonstrates a strong correlation between opioid prescriptions

and opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

103. Contrary to the Pharmaceutical Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients, who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

104. Opioid-related cases of NAS are rising at such a rapid pace that cities, counties and health care systems are unable to keep up logistically.

**DISTRIBUTOR DEFENDANTS' WRONGFUL CONDUCT**

105. Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain, including at the pharmacy level when prescriptions are filled for any reason other than a legitimate medical purpose.

106. For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

107. Diversion occurs at the pharmacies, including whenever a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose or not in the usual course of practice. Some of the signs that a prescription may have been issued

for an illegitimate medical purpose include when the patient seeks to fill multiple prescriptions from different doctors (a/k/a doctor shopping), when they travel great distances between the doctor or their residence and the pharmacy to get the prescription filled, when they present multiple prescriptions for the largest dose of more than one controlled substance, or when there are other "red flags" surrounding the transaction. These signs or "red flags" should trigger closer scrutiny of the prescriptions by the pharmacy and lead to a decision that the patient is not seeking the medication for purposes to treat a legitimate medical condition. In addition to diversion via prescription, opioids are also diverted from retail outlets when stolen by employees or others.

108. Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

109. Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

110. Every year, millions of people in the United States misuse and abuse opioid pain relievers that can lead to addiction, neonatal abstinence syndrome, overdose and death.

111. Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

112. The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

113. Petitioner K.E.R., uniquely and significantly, has been damaged by the effects of the Distributor Defendants' opioid diversion.

114. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise

reasonable care to prevent the threatened harm.

115. In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*. and its implementing regulations and the Louisiana Uniform Controlled Dangerous Substances Law. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

116. By violating the CSA and the Louisiana Uniform Controlled Dangerous Substances Law, the Distributor Defendants are also liable under the law of Louisiana as herein alleged.

117. The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

118. Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity that manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the legal to the illicit marketplace, and there is enormous potential for harm to the public.

119. All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

120. To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances, including registration and tracking

requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("'ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances, acquisition transactions, and distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

121. Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. 21 U.S.C. § 827(d) (l); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

122. In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. 21 U.S.C. §§ 827(a)(3), 1304.2l(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

123. To maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 130 1.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. 21 CFR § 1301.71.

124. For years the Distributor Defendants have known of the problems and consequences of opioid diversion in the supply chain, and have committed repeated violations of the laws and regulations of the United States as cited above consequently making them liable under Louisiana law.

125. To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions. Since 2006, the DEA has conducted one-on-one briefings with distributors regarding their downstream customer sales, due diligence responsibilities, and legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA emphasized the "red flags" distributors should look for to identify potential diversion.

126. Since 2007, the DEA has hosted no less than five conferences to provide opioid distributors with updated information about diversion trends. The Defendant Distributors attended at least one of these conferences, which allowed for questions and discussions. The DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and distributors. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.

127. On September 27, 2006 and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

128. The September 27, 2006 letter reminded registrants that they were required by law to exercise due diligence to avoid filling orders that could be diverted into the illicit market. The DEA explained that as part of the legal obligation to maintain effective controls against diversion, the distributor was required to exercise due care in confirming the legitimacy of each and every order prior to filling. It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances

while ordering few if any other drugs; disproportionate ratio of ordering controlled substances versus non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

129. On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded registrants that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

130. The Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," emphasizing the critical role of each member of the supply chain in distributing controlled substances.

131. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

132. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

133. For example, a Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. He further extolled that Cardinal was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any *outside* criminal activity." (emphasis added).

134. McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our Country."

135. These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

136. In addition to the obligations imposed by law, through their own words, representations, and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic. In this voluntary undertaking, the Distributor Defendants have miserably and negligently failed.

137. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies- including actions by the DEA related to violations of the Controlled Substances Act.

138. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. In December 2016, a Department of Justice press release announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act. In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to certain pharmacies.

139. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. McKesson also was supposed to implement tougher controls regarding opioid diversion. McKesson utterly failed. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single

consumer. In 2015, McKesson was in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017, it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

140. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

141. Relying upon state laws and regulation, various State Boards of Pharmacy have directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion, a duty recognized under state laws and regulations.

142. Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

143. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to Petitioner and the Class.

144. The Distributor Defendants have supplied massive quantities of prescription opioids in Louisiana with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

145. Each Distributor Defendant knew or should have known that the amount of the opioids that it allowed to flow into Louisiana was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

146. The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II

controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in Louisiana; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

147. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing patients and citizens of Louisiana to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

148. On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the patients and citizens of Louisiana, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

149. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of Louisiana and in the geographic area served by its hospitals with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

150. It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

151. The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

152. The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed to patients and citizens of Louisiana were being dispensed based on

invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, Petitioner and the Class.

153. The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in Louisiana, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas-and in such quantities, and with such frequency- that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

154. If any of the Distributor Defendants adhered to effective controls to guard against diversion, Petitioner and the Class would have avoided significant damages.

155. The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting Louisiana. Their participation and cooperation in a common enterprise has foreseeably caused damages to Petitioner and the Class. The Distributor Defendants knew full well that Petitioner and the Class would be unjustly forced to bear these injuries and damages.

156. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Petitioner and the Class. Their conduct poses a continuing economic threat to the communities that must deal with ongoing needs of children afflicted with NAS.

<u>**PHARMACY DEFENDANT FAMILY DRUG MART'S WRONGFUL CONDUCT**</u>

157. Pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

158. Pharmacies are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor, even one registered under the CSA to dispense opioids, if the prescription is not for a legitimate medical purpose.

159. The CSA imposes duties and requirements on the conduct of the Pharmacy Defendant. These requirements, along with their related regulations and agency interpretations,

set a standard of care for pharmacy conduct.

160. The CSA requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

161. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."

162. Pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.

163. By filling prescriptions of questionable or suspicious origin in violation of the CSA, Pharmacy Defendant Family Drug Mart has violated Louisiana's law as alleged herein.

164. The DEA's 2010 "Practitioner's Manual" section on "Valid Prescription Requirements" instructs that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription." Filling such a prescription is illegal. This Manual states: "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted."

165. The DEA (as well as state pharmacy boards, national industry associations, and continuing educational programs) have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient. The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

166. The industry guidance tells pharmacists how to recognize stolen prescription pads; prescription pads printed using a legitimate doctor' s name, but with a different call back number that is answered by an accomplice of the drug-seeker; prescriptions written using fictitious patient names and addresses, and so on.

167. Questionable or suspicious prescriptions include: prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; prescriptions that look "too good" or where the prescriber's handwriting is too legible; prescriptions with quantities or dosages that differ from usual medical usage; prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; photocopied prescriptions; or prescriptions containing different handwritings. Most of the time, these attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

168. Signs that a customer is seeking opioids for the purpose of diversion include customers who: appear to be returning too frequently; are seeking to fill a prescription written for a different person; appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; are not regular patrons or residents of the community, and show up with prescriptions from the same physician; drive long distances to have prescriptions filled; seek large volumes of controlled substances in the highest strength in each prescription; seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and pay large amounts of cash for their prescriptions rather than using insurance. Ignoring these signs violates industry standards and DEA guidelines.

169. Other "red flags" include when prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; prescriptions written in excess of the amount needed for proper therapeutic purposes; prescriptions obtained through disreputable or illegal web-based pharmacies; and patients receiving multiple types of narcotic pain killers on the same day.

170. All of these issues have been presented by the DEA in pharmacist training programs throughout the United States and have been used as examples by individual State Boards of Pharmacy and the National Association of Boards of Pharmacy.

171. Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist is ever in doubt, he or she must ask for proper identification. If a pharmacist believes

the prescription is forged or altered, he or she should not dispense it and call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

172. A standard of care for the Pharmacy Defendant is also set by applicable professional regulations in the state of Louisiana. It is a violation of professional standards not to attempt to address the suspected addiction of a patient to a drug dispensed by the pharmacist, if there is reason to believe the patient may be addicted.

173. On information and belief, the Pharmacy Defendant regularly filled prescriptions in circumstances where red flags were present (and sometimes many red flags).

174. On information and belief, the Pharmacy Defendant regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

175. On information and belief, the Pharmacy Defendant have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions, or protect against corruption or theft by employees or others.

176. On information and belief, the Pharmacy Defendant utilizes monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

177. In failing to take adequate measures to prevent substantial opioid-related injuries that have affected Petitioner and the Class, the Pharmacy Defendant has breached its duties under the "reasonable care" standard, professional duties under the relevant standards of professional practice, and requirements established by federal law under the CSA.

178. It is foreseeable to the Pharmacy Defendant that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers, Louisiana citizens who may use the wrongfully-dispensed opioids and Petitioner and the Class.

179. It is reasonably foreseeable to the Pharmacy Defendant that, when unintended users gain access to opioids, tragic yet preventable injuries and damages will result, including overdoses and newborns with NAS.

180. At all relevant times, the Pharmacy Defendants has engaged in improper dispensing practices, and continue to do so, despite knowing full well it could take measures to substantially eliminate their complicity in opioid diversion.

181. At all relevant times, the Pharmacy Defendant engaged in these activities, and continue to do so, knowing full well that Louisiana communities would have to provide or pay for additional neo-natal medical services, emergency services, and other necessary services, and straining these communities' resources.

182. It is reasonably foreseeable to the Pharmacy Defendant that Petitioner and Class members would be forced to bear substantial expenses as a result of the Pharmacy Defendant's acts.

183. The Pharmacy Defendants were also aware of the magnitude of the opioid diversion crisis based on investigations into pharmacy practices elsewhere.

184. Pursuant to Louisiana Civil Code 2520 *et seq.*, Defendants, through their manufacture, marketing, sales, and/or distribution of prescription opioids, warranted to doctors, patients, and Petitioner that these opioids were free of redhibitory effects.

185. Defendants owed a duty to Petitioner, as the child of a buyer of prescription opioids, that the prescription opioids would be free from redhibitory defects.

186. Petitioner's mother, as a purchaser of the prescription opioids, had no knowledge of the defects and could not have discovered the defects. The redhibitory defects in the prescription opioids were neither known nor apparent to Petitioner.

187. The risk of addiction from opioid use and inability of opioids to treat non-cancer chronic pain are redhibitory defects that rendered Defendants' prescription opioids totally or at least partially useless for their intended purposes.

188. Petitioner's mother would not have paid for the prescription opioids if she had known of their redhibitory defects.

189. Defendants had actual knowledge that the prescription opioids they manufactured, marketed, sold, and/or distributed had redhibitory defects but omitted to inform doctors, patients and Petitioner's mother of these defects.

190. Instead, Defendants falsely declared that prescription opioids were safe and effective when Defendants knew they were not.

191. The redhibitory defects existed at the time Petitioner's mother purchased the

prescription opioids.

192. But for Defendants' false representations and omissions about the uses of prescription opioids, Petitioner would not have purchased these prescriptions.

193. Defendants breached their warranty of redhibition which directly and proximately caused Petitioner to suffer the damages alleged herein.

194. Due to the redhibitory defects in the prescription opioids, Petitioner is entitled to and does demand a rescission of all sales of prescription opioids paid for, including legal interest thereon paid from the date of sale as allowed by law. Defendants are liable to Petitioner for all amounts spent by Petitioner with interest from the time of purchase, as well as reimbursement for the reasonable expenses occasioned by the sale and for all related damages, including consequential damages, costs and attorney fees. La. Civ. Code art. 2545.

195. Petitioner seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from the Defendants' breach of the warranty of redhibition.

196. Petitioner seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including, *inter alia*, return of the purchase price, economic loss, attorney fees and costs, and interest from the date suit is filed.

197. The Louisiana Product Liability Act ("LPLA") states a "manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. Rev. Stat. Ann. § 9:2800.54(A).

198. A "reasonably anticipated use" under La. RS. 9:2800.53(7) means "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." Reasonably anticipated use also includes some misuses.

199. An "adequate warning" under the LPLA "means a warning or instruction that would lead an ordinary reasonable user… of a product to contemplate the danger in using… the product and either to decline to use… the product or, if possible, to use… the product in such a manner as to avoid the damage for which the claim is made." La. R.S. § 9:2800.53.

200. Defendants' product was unreasonably dangerous because it lacked adequate warning under La. RS. 9:2800.57, as "the product possessed a characteristic that may cause

damage and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product."

201. Defendants knew that the damage causing characteristics of Defendants' product include its addictive properties on potential mothers and its in utero impacts on their future children.

202. Defendants knew that opioids are too addictive and to debilitating for long-term use for chronic pain, barring exceptional circumstances. Defendants knew that the only safe uses for their product were end of life care, short term pain relief after surgery, and pain relief related to cancer. Defendants failed to warn potential mothers and pregnant women of the dangers of using their product outside of these areas.

203. Defendants knew that prolonged use of opioids leads to decreased effectiveness, requiring increases in doses to achieve the same level of pain relief, markedly increasing the risk of significant side effects and addiction. Defendants conducted studies documenting these risks, yet failed to publish the results or warn of the documented risks.

204. The risks of opioid addiction and the risk to children in utero are grave and Defendants had a duty to warn about these risks.

205. Providing such warnings would have been easily feasible, but would have interfered with Defendants' marketing efforts. Instead, Defendants' engaged in a multimillion dollar marketing and advertising effort promoting falsehoods and minimizing the risk of addiction and withdrawal from long term opioid use.

206. Because of Defendants' knowledge of the risks to mothers and their neonatal children, and their extensive efforts to obscure these risks, Defendants are liable for all resulting damages caused to K.E.R. and the Class.

207. "A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control: (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. R.S. § 9:2800.56.

208. Defendants designed their product in such a way that it could easily be abused by crushing of pills with the resulting powder ingested by inhalation or injection.

209. Defendants were aware that their products were being abused in this manner on a large scale, making this a "reasonably anticipated use."

210. Despite this knowledge, Defendants only recently altered the design of their product to be "enteric," that is, changed it to a form that prevented such crushing and consumption. This change was only made after years of public and legal pressure.

211. Further, Defendants promoted their unreasonably dangerous design by actively undercutting the prescription of alternative nonsteroidal anti-inflammatory drugs, pushing the misinformation that such non-opioid drugs were not effective for the treatment of long term pain.

212. Defendants' product was also unreasonably dangerous because it failed to conform to express warranties of the manufacturer. "A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue." La. R.S. § 9:2800.58.

213. "Express warranty," under La. R.S. § 9:2800.53, "means a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance."

214. Defendants expressly warranted that their product had little risk of addiction and that it was appropriate for the treatment of long term pain. In particular, Defendants individually and collectively, warranted that:

a. Addiction to opioids is rare and limited to extreme cases of unauthorized dose escalations;

b. Taking opioids as prescribed usually does not result in addiction or addictive disorders;

c. Opioids improve patients' function;

d. Opioids improve patients' quality of life;

e. The addiction risk of opioids can be easily managed;

f. Withdrawal from opioids is easily managed;

g. Long-term opioid therapy is appropriate for chronic, non-cancer pain;

h. Increased dosing of opioids poses no significant additional risks.

215. Defendants disseminated many of these warranties through third parties and unbranded messages because they appeared to uninformed observers to be independent. As described throughout this Petition Defendants collectively and individually adopted this strategy to defraud healthcare consumers, insurers, doctors, patients, and the public at large and cannot now disavow these warranties as anything but their own. Even where such unbranded messages were disseminated through third-party vehicles, Defendants adopted these messages as their own when they cited to, edited, approved, and distributed such materials knowing they were false, misleading, unsubstantiated, imbalanced, and incomplete.

216. Moreover, Defendants took an active role in guiding, reviewing, and approving many of the false warranties issued by third parties, ensuring that Defendants were consistently in control of their content and third party mouth pieces. By funding, directing, editing, and distributing these materials, Defendants exercised control over their deceptive messages and acted in concert with these third parties fraudulently to promote the use of opioids for treatment of chronic pain by use of false warranties and other misleading statements.

217. Defendants' express warranties were false. Such warranties induced medical providers to prescribe, and potential mothers to purchase, Defendants' product when they otherwise would not because they believed these warranties to be true. This constitutes "reasonably anticipated use."

218. Defendants went so far as to invent the term "pseudo-addiction" to obscure the fact that their product in fact did cause addiction and associated withdrawal symptoms.

219. Opioid prescriptions have proliferated because of Defendants' conduct, leading a proliferation of cases of addiction, with addicted mothers giving birth to children suffering from NAS.

220. Defendants caused damages to K.E.R. and the Class and are liable to pay the damages they have caused.

221. Accordingly Defendants' are liable for breaches of the LPLA for (1) unreasonably dangerous design (2) inadequate warning and (3) unreasonably dangerous for breach of express warranties.

222. In addition to the foregoing LPLA violations, since it is the exclusive remedy for all causes of action arising from a product, save redhibition, Defendants are also liable under the LPLA for their conspiracy and acts in further of the conspiracy on the market by withholding

accurate information concerning the opioids unreasonably dangerous characteristics and qualities and transmitting inaccurate information about their opioid products' unreasonably dangerous characteristics and qualities to health care professional who serve as learned intermediaries.

223. Petitioners claims that Defendants are liable for the diversionary market they created by their conspiracy, acts, and omissions as recounted above.

224. The legal issue of whether Defendants are liable for the diversionary market under the LPLA or the general Civil Code provisions is *res novo* in Louisiana.

225. The Pharmaceutical Defendants continuously supplied prescription opioids to the Distributor Defendants despite having actual or constructive knowledge that said Distributors were habitually breeching their duties and violating the CSA. The Distributor Defendants continuously supplied prescription opioids to the Pharmacy Defendants despite having actual or constructive knowledge that said pharmacies were habitually breaching their duties and violating the CSA.

226. Without the Distributor Defendants' supply of prescription opioids, the Pharmacy Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout Louisiana.

227. The Pharmacy Defendants continuously paid the Distributor Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs. The Distributor Defendants continuously paid the Pharmaceutical Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

228. No Defendant in this opioid network would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party, and none would have succeeded so significantly without engaging in the wrongful conduct as herein alleged.

229. The Pharmaceutical Defendants likewise benefitted from this distribution conspiracy in that the more pervasive opioid diversion became, the more the Pharmaceutical Defendants profited. Despite access to the same information in the hands of the Distributor Defendants, the Pharmaceutical Defendants ignored the warning signs of opioid diversion.

230. As a result of the concerted actions between and among the Defendants, the Petitioner and the class have suffered damages.

231. Petitioner and the Class demand judgment against each Defendant for

compensatory damages.

232. Petitioner has standing to bring an action under the Louisiana Racketeering Act action as a "person who is injured by reason of any violation of the provisions of R.S. 15:1353." La. Rev. Stat. Ann. § 15:1356(E).

233. The Louisiana Racketeering Act prohibits "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under . . . the Uniform Controlled Dangerous Substances Law," among other enumerated acts. La. Rev. Stat. Ann. § 15:1352(A). Opioids are classified as both Schedule I and Schedule II drugs under Louisiana law. La. Rev. Stat. Ann. § 40:964. The Louisiana Uniform Controlled Dangerous Substances Law explicitly provides that "[p]hysical dependence is an expected result of opioid use." La. Rev. Stat. Ann. § 40:961(29.1). Unauthorized manufacture, distribution, or dispensing of opioids constitute predicate acts of racketeering activity under the Louisiana Racketeering Act. La. Rev. Stat. Ann. § 15:1352(A)(13) (citing La. Rev. Stat. Ann. § 40:967(A)).

234. Defendants violated section 15:1353 of the Louisiana Racketeering Act by knowingly, intentionally, and unlawfully aiding and abetting each other to commit violations of the Louisiana Uniform Controlled Dangerous Substances Law.

235. Defendants also violated section 15:1353 of the Louisiana Racketeering Act by knowingly receiving "proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in immovable property or in the establishment or operation of any enterprise." La. Rev. Stat. Ann. § 15:1353(A).

236. Defendants conducted the Opioid Diversion Enterprise, as defined above, through a pattern of racketeering activity in violation of Section 15:1353(C) and have conspired to violate Section 15:1353(C) in violation of Section 15:1353(D). La. Rev. Stat. Ann. § 15:1353.

237. Defendants violated Section 15:1353(D) by knowingly, intentionally, and unlawfully aiding and abetting each other and the Opioid Diversion Enterprise and conspired to conduct and participate, directly and indirectly, in the conduct of the Opioid Diversion Enterprise, through the pattern of racketeering activity described herein. La. Rev. Stat. Ann. § 15:1353(D).

238. Defendants' Opioid Diversion Enterprise existed as an "enterprise" as defined in Section 15:1352(B). The Defendants' Opioid Diversion Enterprise existed as an association in fact and included unlawful as well as lawful enterprises. La. Rev. Stat. Ann. § 15:1352(B).

239. As described above and as fully incorporated herein, the violations set forth herein constitute "racketeering activity" within the meaning of sections 15:1352(C) and 15:1353 with at least two such acts of racketeering activity having occurred within the past five years.

240. Defendants' violations of law and their pattern of racketeering activity directly and proximately caused Petitioner and the Class injury, as described above in allegations expressly incorporated herein by reference. But for the Defendants' conduct, Petitioner would not have purchased Defendants' product.

241. Petitioner's injuries and those of the Class were directly caused by Defendants' racketeering activities.

242. Petitioner seeks all legal and equitable relief as allowed by law, including inter alia actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney's fees and all costs and expenses of suit and pre- and post-judgment interest. La. Rev. Stat. Ann. § 15:1356(E).

243. Petitioner K.E.R. and Class Members state a claim for medical monitoring and future medical expense damages directly related to their manifest physical and mental injuries and/or diseases sustained at birth as required by C. C. Art. 2315(B) and incorporated by Louisiana Revised Statute 9:2800.535.

244. The Louisiana Civil Code art. 1953 states that "fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

245. Louisiana jurisprudence indicates that the elements of the tort of fraud are: (1) a misrepresentation of material fact made with the intent to deceive when there was (2) reasonable or justifiable reliance by the plaintiff and (3) resulting injury.

246. Defendants, individually and acting through their employees and agents, and in concert with each other, misrepresented material facts with regards to the use of opioids to treat chronic pain through various means including but not limited to:

a. Creating and/or disseminating advertisements, scientific studies, CMEs, and

patient and prescriber education materials that contained false, misleading, and untrue statements concerning the ability of opioids to improve function long term;

b. Creating and/or disseminating advertisements, scientific studies, CMEs, and patient and prescriber education materials that contained false, misleading, and untrue statements concerning the ability of opioids to improve quality of life while concealing contrary data;

c. Creating and/ or disseminating advertisements, scientific studies, CMEs, and patient and prescriber education materials that contained false, misleading, and untrue statements concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic noncancer pain, including known rates of abuse and lack of validation for long term efficacy;

d. Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction, even for high-risk patients;

e. Disseminating misleading statements concealing the true risk of addiction in the elderly;

f. Endorsing, directly distributing, and assisting in the distribution of publications that presented an Imbalanced treatment of the long term and dose-dependent risks of opioids versus NSAIDs;

g. Falsely claiming that withdrawal is simply managed;

h. Misrepresenting that increased doses of opioids pose no significant additional risks.

247. Defendants' false representations and concealments were made with the intent to deceive Louisiana consumers who used or paid for opioids for chronic pain; Louisiana physicians who prescribed opioids to consumers to treat chronic pain; and Louisiana payors, who purchased or covered the purchase of, opioids for chronic pain.

248. Defendants knew that, with prolonged use, the effectiveness of opioids wanes, requiring increases in doses to achieve pain relief and markedly increasing the risk of significant side effects and addiction.

249. Defendants knew that controlled studies of the safety and efficacy of opioids were

limited to short-term use in managed settings where the risk of addiction and other adverse outcomes was significantly minimized.

250. Despite the foregoing knowledge, in order to expand the market for opioids and realize blockbuster profits, Defendants sought to create a false perception of the safety and efficacy of opioids in the minds of medical professionals and members of the public that would encourage the use of opioids for longer periods of time and to treat a wider range of problems, including such common aches and pains as lower back pain arthritis, and headaches, and did so through their material misrepresentations including those listed above.

251. Because Defendants' false marketing campaign did so completely saturate the market, were promulgated in part by third parties positioned as experts, and extend to almost every available source of information including prescribing guidelines, CMEs, patient educational materials, journal publications, etc., Plaintiff did reasonably rely on these false representations made by Defendants and third parties in their control.

252. But for these false representations and concealments of material fact, Plaintiff would not have purchased or covered the purchase of opioids for chronic pain. But for these false representations, there would not have been a massive opioid addiction epidemic that swept up victims like the Petitioner's mother.

253. As a direct and proximate case of Defendants' fraudulent conduct, Plaintiff has been injured, suffering actual damage.

254. By virtue of the acts alleged above, the running of any prescriptive period has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative fraudulent claims, misrepresentation, and omissions, actively concealed from Petitioner and the Class the deceptive marketing, promotion, and true risks associated with opioid pain medication.

255. By reason of Defendants' actions and omissions and of the actions and omissions by third parties under Defendants' control, Petitioner and the Class, were unaware, and could not reasonably have known or have learned through reasonable diligence, the wrongdoing, fraudulent claims, and misrepresentation regarding opioids and the true risks associated with opioids.

256. Furthermore, by virtue of the acts alleged above, Defendants are estopped from relying on any prescriptive period due to its fraudulent concealment of the true character, quality,

and nature of opioid pain medication. Defendants were under a duty to disclose the true character, quality, and nature of opioid pain medication because this was non-public information over which Defendants had and continues to have exclusive control, and because Defendants knew that this information was not available to Petitioner and the Class, Louisiana patients or their medical providers. Therefore, Defendants are estopped from relying on any prescriptive period due to its intentional concealment of these facts.

257. Petitioners seek to represent the following class of individuals:

*All Louisiana minors who at birth who were diagnosed at or shortly after birth with neonatal abstinence syndrome (NAS) and whose mother (1) used opioids during gestation and (2) had a medical prescription for opioids before or during the gestation period.*

258. Excluded from the Class are children of the Defendants and their officers, directors, and employees, as well as the Court and its personnel.

259. The action brought by Petitioner is maintainable as a class action under La. C.C.P. art. 591 for the following reasons:

260. Petitioner is a representative of claimants so numerous that joinder of the individual suits is impractical. Although the precise number of Class Members in Louisiana is currently unknown, Petitioner believes that the putative class is in the thousands, if not more;

261. There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members, mainly whether Defendants' and their agents' policies and procedures that encouraged the continued use and abuse of opioids despite knowing the dangers caused harm to the Class.

262. Petitioner's injuries are typical of the experience of the Class Members, having suffered personal injury and increased health risks necessitating medical monitoring and future medical treatment, that are typical of the experience of the Class Members. Petitioner's interests are identical to and aligned with those of other Class Members. Petitioners and the Class Members have suffered an array of damages all stemming from the common trunk of facts and issues related to exposure to Defendants' manufacture and distribution of opioids.

263. Petitioner and undersigned counsel are adequate representatives of the Class. Petitioner is a of the Class. Given Petitioner's losses, Petitioner has the incentive and is committed to the prosecution of this action for the benefit of the Class. Petitioner has no interests antagonistic to those of the Class, nor that would cause them to act adversely to the best

interests of the Class. Moreover, Petitioner has retained counsel experienced in class action litigation and experienced in drug litigation.

264. This action is maintainable as a class action under Louisiana Code of Civil Procedure article 591 *et seq.* because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants;

265. This action is maintainable as a class action under Louisiana Code of Civil Procedure article 591 *et seq.* because Defendants have acted or refused to act on grounds that apply generally to the Class, so that equitable and injunctive relief are appropriate respecting the class as a whole, including a medical monitoring protocol and treatment programs, and injunctive relief to prevent recurrence of the Defendants' harmful conduct in the future. As a result of Defendants' deceptive conduct, Class Members suffer NAS and developmental issues. Early detection of neonatal exposure and developmental issues through examination and testing has significant value Class Members because such detection will help Class Members monitor and minimize the harm therefrom. Due to neonatal opioid exposure by Class Members, surveillance, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of NAS and its effects. As a remedy for the deceptive and unconscionable conduct alleged in this Complaint, Defendants should be required to fund a medical monitoring program designed to identify and combat NAS and its effects on the Class and provide desperately needed neonatal care and treatment programs as NAS affected children develop.

266. The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other methods for the fair and equitable adjudication of this action. Fundamentally, all of the Petitioners' claims arise out of a single course of conduct by Defendants that led to the Opioid Crisis. Although this crisis affects children across Louisiana and the United States, it can be traced back to actions made jointly and severally by the small group of Defendants named here. Petitioner and Class Members common proof of Defendants' liability would involve the same cast of characters, events, discovery, documents, fact witnesses, and experts if tried separately.

267. Further, any denial of liability and defenses raised by the Defendants would be

applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

268. The need for proof of Petitioner's and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic and non-economic losses can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court-approved methodologies with the assistance of court-appointed personnel, including Special Masters. Certain types or elements of damage are subject to proof using aggregate damage methodologies or simply rote calculation and summation.

269. A class action is superior to maintenance of these claims on a claim-by-claim basis when all actions arise out of the same circumstances and course of conduct. A class action allows the Court to process all rightful claims in one proceeding. Class litigation is manageable considering the opportunity to afford reasonable notice of significant phases of the litigation to Class Members and permit distribution of any recovery. The prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members in this action, is impracticable and would create a massive and unnecessary burden on the resources of the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of each member of the class or subclasses, should that be determined to be appropriate. The conduct of this action as a class action conserves the resources of the parties and the court system, protects the rights of each member of the class, and meets all due process requirements.

**PRAYER FOR RELIEF**

WHEREFORE, the Petitioner K.E.R., individually and on behalf of all those similarly situated, prays that after citation and service (1) that the Court certify this Class pursuant to La. C.C.P. art. 591, (2) that there be judgement in Petitioner's favor and against the Defendants for all relief including but not limited to past and future general damages, past and future special damages, past and future economic loss, medical monitoring, injunctive relief, civil penalties, treble damages pursuant to La. R.S. 51.1409(A), the return of the purchase price, punitive damages, attorney fees and costs, interest from the date suit is filed, and for all other relief necessary under the premises, and (3) that there be a trial by jury on all issues.

Dated this 15 day of Feb, 2018

Respectfully submitted,

By: ____________________

Cooper Law Firm, L.L.C.
Celeste Brustowicz, Esq. 16835
Barry Cooper, Esq.27202
1525 Religious Street
New Orleans, Louisiana 70130
Phone: (504) 566-1558
Fax: (504) 581-9055
cbrustowicz@sch-llc.com

Jack W. Harang 15083
2433 Taffy Dr.
Kenner, LA 70065

MARTZELL, BICKFORD & CENTOLA
SCOTT R. BICKFORD (#1165)
LAWRENCE J. CENTOLA, III (#27402)
NEIL F. NAZARETH (#28969)
SPENCER R. DOODY (#27795)
JASON Z. LANDRY (#33932)
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504) 581-7635 (Fax)
lcentola@mbfirm.com

PERRIN, LANDRY, deLAUNAY
Warren A. Perrin (#10498)
251 La Rue France
P. O. Box 53597
Lafayette, LA 70505
(337) 233-5832
(337) 235-4382

Schonekas, Evans, McGoey & McEachin, L.L.C.
Billy Gibbens
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Fax: (504) 680-6051
billy@semmlaw.com

WINCH LAW FIRM, LLC
Justin L. Winch, Esq. (LSBA No. 36323)
14616 Leon Rd, Suite 101
Abbeville, LA 70510
Phone: (504) 214-3400
Fax: (831) 295-6497
Email: justin.winch@winchlawfirm.com

Please Hold Service at this Time

A TRUE COPY
DYP. CLK, 22nd JUD. DIST. COURT
ST. TAMMANY PARISH, LA.
Bridget H. Hickman, Deputy Clerk

# RETURN

Tyler M. Roach

VS: #2018-10930 "A"

McKesson Corporation, et al

**22nd Judicial District Court**

**Parish of St. Tammany**

**State of Louisiana**

TO THE DEFENDANT JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.
**Via the Louisiana Long Arm Statute**

through its Agent for Service of Process, C.T. Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101 **(Personal Service)**

You are hereby summoned to comply with the demand contained in the petition, of which a true and correct copy (exclusive of exhibits), accompanies this citation, or make an appearance, either by filing an answer or other pleading, before the 22nd Judicial District Court, at the Justice Center, 701 N. Columbia Street, Covington, LA, in and for the Parish of St. Tammany, State of Louisiana, within THIRTY (30) days after the filing in the record of the affidavit of the individual who either mailed, utilized the services of a commercial carrier or actually delivered the process to the defendant hereof, under penalty default judgment against you.

By order of the Honorable Judges of said Court this 16th day of March, 2018.

*Melissa R. Henry*, *Clerk of Court*

BY: [signature]
Bridget Hickman Deputy Clerk

Issued: 3/21/18

Attorney: (P1)
Celeste Brustowicz, Esq.
1525 Religious Street
New Orleans, LA 70130

Received on __________, 2018, and on __________, 2018,

I served a true copy of the within __________,

on __________ in person,

at domicile with __________

in __________ Parish, a distance of _____ miles from the Justice Center.

__________
Deputy Sheriff

Parish of __________

101-30 day Long Arm Service Citation
Rev 7/16

CT Corporation

**Service of Process Transmittal**
04/05/2018
CT Log Number 533093928

**TO:** Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

**RE:** **Process Served In Pennsylvania**

**FOR:** Ortho-McNeil-Janssen Pharmaceuticals, Inc. (Former Name) (Domestic State: PA)
Janssen Pharmaceuticals, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Tyler M. Roch, natural Tutor on behalf of his minor child, Baby K.E.R. and as class representative of all neonatal abstinence syndrome afflicted babies born in Louisiana, Pltf. vs. McKesson Corporation, et al., Dfts. // To: Ortho-McNeil-Janssen Pharmaceuticals, Inc., etc. |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Petition |
| **COURT/AGENCY:** | 22nd Judicial District Court - Parish of St. Tammany, LA<br>Case # 201810930A |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Harrisburg, PA |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/05/2018 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Pennsylvania |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S) / SENDER(S):** | Celeste Brustowicz<br>Cooper Law Firm, L.L.C.<br>1525 Religious Street<br>New Orleans, LA 70130<br>504-566-1558 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/05/2018, Expected Purge Date: 04/15/2018<br><br>Image SOP<br><br>Email Notification, RA-JJCUS LDSOP RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** | CT Corporation System |
| **ADDRESS:** | 600 N. 2nd St., Ste 401<br>Harrisburg, PA 17101-1071 |
| **TELEPHONE:** | 609-538-1818 |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

CERTIFIED MAIL

7017 3040 0000 8640 9788

$13.80 US POSTAGE
PITNEY BOWES

Cooper Law Firm
1525 Religious Street
New Orleans, LA 70130

ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.
C.T. Corporation System
600 North 2nd Street
Suite 401
Harrisburg, PA 17101

**COOPER LAW FIRM, L.L.C.**

1525 Religious Street
NEW ORLEANS, LOUISIANA 70130

TELEPHONE: (504) 309-0009
FACSIMILE: (504) 309-6989

Celeste Brustowicz
Licensed in La., Ca., & Ms.
cbrustowicz@sch-llc.com

March 29, 2017

ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.
Through its Agent for Service of Process
C.T. Corporation System
600 North 2nd Street Suite 401
Harrisburg, PA 17101

RE: Tyler M. Roach, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana vs. McKesson Corporation, et al.
22nd JDC, Parish of St. Tammany
Docket No.: 2018-10930 "A"

Dear Sir or Madame:

Please be advised that Cooper Law Firm represents Tyler Roach in the captioned matter. A lawsuit has been filed against you in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana. Enclosed herewith is a citation and a certified copy of that lawsuit.

Pursuant to the Louisiana Long Arm Statute, La. R.S. 13:3201, et seq., by your receipt of the enclose documents via certified mail, return receipt requested, effective service of process has been made upon you.

You have thirty (30) days from the date of receipt of this letter within which to file responsive pleadings. I would suggest that you consult with an attorney as soon as possible. Awaiting your response, I am,

Yours very truly,
COOPER LAW FIRM

Lisa Richardson
Paralegal

Enclosures

# SERVE

Tyler M. Roach

VS: #2018-10930 "A"

McKesson Corporation, et al

22nd Judicial District Court

Parish of St. Tammany

State of Louisiana

TO THE DEFENDANT ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.
**Via the Louisiana Long Arm Statute**

through its Agent for Service of Process, C.T. Corporation System, 600 North 2nd Street

Suite 401, Harrisburg, PA 17101 **(Personal Service)**

**You are hereby summoned to comply with the demand contained in the petition, of which a true and correct copy (exclusive of exhibits), accompanies this citation, or make an appearance, either by filing an answer or other pleading, before the 22nd Judicial District Court, at the Justice Center, 701 N. Columbia Street, Covington, LA, in and for the Parish of St. Tammany, State of Louisiana, within THIRTY (30) days after the filing in the record of the affidavit of the individual who either mailed, utilized the services of a commercial carrier or actually delivered the process to the defendant hereof, under penalty default judgment against you.**

By order of the Honorable Judges of said Court this 16th day of March, 2018.

*Melissa R. Henry*, *Clerk of Court*

BY: S/ BRIDGET HICKMAN

Bridget Hickman Deputy Clerk

Issued: 3/21/18

Attorney: (P1)
Celeste Brustowicz, Esq.
1525 Religious Street
New Orleans, LA 70130

A TRUE COPY
DYP. CLK. 22nd JUD. DIST. COURT
ST. TAMMANY PARISH
Bridget H. Hickman, Deputy Clerk

Received on ____________, 2018, and on ____________, 2018,

I served a true copy of the within ____________,

on ____________ in person,

at domicile with ____________

in ____________ Parish, a distance of ________ miles from the Justice Center.

____________
Deputy Sheriff

Parish of ____________

101-30 day Long Arm Service Citation
Rev 7/16

**COOPER LAW FIRM, L.L.C.**

1525 Religious Street
NEW ORLEANS, LOUISIANA 70130

TELEPHONE: (504) 309-0009
FACSIMILE: (504) 309-6989

Celeste Brustowicz
Licensed in La., Ca., & Ms.
cbrustowicz@sch-llc.com

APR 0 3 2018
Law Department

March 29, 2017

JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

RE: Tyler M. Roach, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana vs. McKesson Corporation, et al.
22nd JDC, Parish of St. Tammany
Docket No.: 2018-10930 "A"

Dear Sir or Madame:

Please be advised that Cooper Law Firm represents Tyler Roach in the captioned matter. A lawsuit has been filed against you in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana. Enclosed herewith is a citation and a certified copy of that lawsuit.

Pursuant to the Louisiana Long Arm Statute, La. R.S. 13:3201, et seq., by your receipt of the enclose documents via certified mail, return receipt requested, effective service of process has been made upon you.

You have thirty (30) days from the date of receipt of this letter within which to file responsive pleadings. I would suggest that you consult with an attorney as soon as possible. Awaiting your response, I am,

Yours very truly,
COOPER LAW FIRM

Lisa Richardson
Paralegal

Enclosures

Law Department

SERVE

**Tyler M. Roach**

**VS: #2018-10930 "A"**

**McKesson Corporation, et al**

**22nd Judicial District Court**

**Parish of St. Tammany**

**State of Louisiana**

TO THE DEFENDANT JOHNSON & JOHNSON, **Via the Louisiana Long Arm Statute**

One Johnson & Johnson Plaza, New Brunswick, NJ 08933

**(Personal Service)**

**You are hereby summoned to comply with** the demand contained in the petition, of which a true and correct copy (exclusive of exhibits), accompanies this citation, or make an appearance, either by filing an answer or other pleading, before the 22nd Judicial District Court, at the Justice Center, 701 N. Columbia Street, Covington, LA, in and for the Parish of St. Tammany, State of Louisiana, within **THIRTY (30)** days after the filing in the record of the affidavit of the individual who either mailed, utilized the services of a commercial carrier or actually delivered the process to the defendant hereof, under penalty default judgment against you.

By order of the Honorable Judges of said Court this 16th day of March , 2018.

Melissa R. Henry, *Clerk of Court*

BY: ______________________

Bridget Hickman Deputy Clerk

Issued: 3/21/18

**Attorney: (P1)**
**Celeste Brustowicz, Esq.**
**1525 Religious Street**
**New Orleans, LA 70130**

Bridget H. Hickman, Deputy Clerk

______________________

Received on ______________, 2018, and on ______________, 2018,

I served a true copy of the within ______________________,

on ______________________ in person,

at domicile with ______________________

in ______________ Parish, a distance of ________ miles from the Justice Center.

______________________
Deputy Sheriff

Parish of ______________________

101-30 day Long Arm Service Citation
Rev 7/16

**STATE OF LOUISIANA**

**Twenty Second Judicial District Court for the PARISH OF ST. TAMMANY**

**TYLER M. ROACH, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana**

**Petitioner,**

2018-10930 A
FILED
FEB 26 2018
MELISSA R. HENRY - CLERK
Deputy TRACEY GRAHAM

**VS.**

**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**PURDUE PHARMA L.P.;**
**PURDUE PHARMA, INC.;**
**THE PURDUE FREDERICK COMPANY, INC.;**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC;**
**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.,**
**FAMILY DRUG MART LLC.**

**Defendants.**

**Petition for Redhibitory Vices, Louisiana Products Liability, Louisiana Civil Code art. 2315 (B), Louisiana Civil Code art. 1953, Medical Monitoring, Class Action as per Code of Civil Procedure art. 591, Louisiana Racketeering Act, with Jury Demand**

Comes now, through undersigned counsel, the Petitioner minor child K.E.R., appearing through his natural tutor Tyler M. Roach, and on behalf of all other Louisiana children situated like K.E.R. born in Louisiana with a Neonatal Abstinence Syndrome ("NAS") diagnosis because their mothers were sold, purchased, and consumed opioids in Louisiana during gestation and seek damages, medical monitoring, attorney fees, injunctive relief and all other relief appropriate under the premises.

Date served: 4 / 6 /2018 Product(s): OP
Company(s) served: JJ
Method served: HS FX CM RM OTHER
Date received by LD: 4 / 6 /2018 No postmark: X
Service type: Initial Add'l Refiled Amended Multi #
JJL# 2018006355 Paralegal: DG

CERTIFIED MAIL

7017 3040 0000 8640 9801

$13.80

US POSTAGE

Cooper Law Firm
1525 Religious Street
New Orleans, LA 70130

JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

CT Corporation

**Service of Process Transmittal**
04/05/2018
CT Log Number 533093858

**TO:** Stephanie Youngman
Johnson & Johnson
1 Johnson and Johnson Plz
New Brunswick, NJ 08933-0002

**RE:** **Process Served in Pennsylvania**

**FOR:** Janssen Pharmaceutica Inc. (Former Name) (Domestic State: PA)
Janssen Pharmaceuticals, Inc. (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Tyler M. Roch, natural Tutor on behalf of his minor child, Baby K.E.R. and as class representative of all neonatal abstinence syndrome afflicted babies born in Louisiana, Pltf. vs. McKesson Corporation, et al., Dfts. // To: Janssen Pharmaceutica Inc., etc. |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Petition |
| **COURT/AGENCY:** | 22nd Judicial District Court - Parish of St. Tammany, LA<br>Case # 201810930A |
| **NATURE OF ACTION:** | Deceptive marketing practices relating to prescription opioids |
| **ON WHOM PROCESS WAS SERVED:** | CT Corporation System, Harrisburg, PA |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/05/2018 postmarked: "Not Post Marked" |
| **JURISDICTION SERVED :** | Pennsylvania |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days |
| **ATTORNEY(S) / SENDER(S):** | Celeste Brustowicz<br>Cooper Law Firm, L.L.C.<br>1525 Religious Street<br>New Orleans, LA 70130<br>504-566-1558 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/05/2018, Expected Purge Date: 04/15/2018<br><br>Image SOP<br><br>Email Notification, RA-JJCUS LDSOP RA-JJCUS-LDSOP@its.jnj.com |
| **SIGNED:** | CT Corporation System |
| **ADDRESS:** | 600 N. 2nd St., Ste 401<br>Harrisburg, PA 17101-1071 |
| **TELEPHONE:** | 609-538-1818 |



Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

CERTIFIED MAIL

7017 3040 0000 8640 9771

$13.60
US POSTAGE
PITNEY BOWES

Cooper Law Firm
1525 Religious Street
New Orleans, LA 70130

JANSSEN PHARMACEUTICA INC.
n/k/a JANSSEN PHARMACEUTICALS, INC.
C.T. Corporation System
600 North 2nd Street, Suite 401
Harrisburg, PA 17101

# COOPER LAW FIRM, L.L.C.

1525 Religious Street
NEW ORLEANS, LOUISIANA 70130

TELEPHONE: (504) 309-0009
FACSIMILE: (504) 309-6989

Celeste Brustowicz
Licensed in La., Ca., & Ms.
cbrustowicz@sch-llc.com

March 29, 2017

JANSSEN PHARMACEUTICA INC.
Through its Agent for Service of Process
C.T. Corporation System
600 North 2nd Street Suite 401
Harrisburg, PA 17101

RE: Tyler M. Roach, natural Tutor on behalf of his minor child, Baby K.E.R., and as class representative for all Neonatal Abstinence Syndrome afflicted babies born in Louisiana vs. McKesson Corporation, et al.
22nd JDC, Parish of St. Tammany
Docket No.: 2018-10930 "A"

Dear Sir or Madame:

Please be advised that Cooper Law Firm represents Tyler Roach in the captioned matter. A lawsuit has been filed against you in the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana. Enclosed herewith is a citation and a certified copy of that lawsuit.

Pursuant to the Louisiana Long Arm Statute, La. R.S. 13:3201, et seq., by your receipt of the enclose documents via certified mail, return receipt requested, effective service of process has been made upon you.

You have thirty (30) days from the date of receipt of this letter within which to file responsive pleadings. I would suggest that you consult with an attorney as soon as possible. Awaiting your response, I am,

Yours very truly,
COOPER LAW FIRM

Lisa Richardson
Paralegal

Enclosures

# SERVE

Tyler M. Roach

VS: #2018-10930 "A"

McKesson Corporation, et al

22nd Judicial District Court

Parish of St. Tammany

State of Louisiana

TO THE DEFENDANT JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC. Via the Louisiana Long Arm Statute

through its Agent for Service of Process, C.T. Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, PA 17101 (Personal Service)

You are hereby summoned to comply with the demand contained in the petition, of which a true and correct copy (exclusive of exhibits), accompanies this citation, or make an appearance, either by filing an answer or other pleading, before the 22nd Judicial District Court, at the Justice Center, 701 N. Columbia Street, Covington, LA, in and for the Parish of St. Tammany, State of Louisiana, within THIRTY (30) days after the filing in the record of the affidavit of the individual who either mailed, utilized the services of a commercial carrier or actually delivered the process to the defendant hereof, under penalty default judgment against you.

By order of the Honorable Judges of said Court this 16th day of March, 2018.

Melissa R. Henry, Clerk of Court

BY: S/ BRIDGET HICKMAN

Bridget Hickman Deputy Clerk

Issued: 3/21/18

A TRUE COPY

DYP. CLK, 22nd JUD. DIST. COURT, ST. TAMMANY PARISH, LA

Bridget H. Hickman, Deputy Clerk

Attorney: (P1)
Celeste Brustowicz, Esq.
1525 Religious Street
New Orleans, LA 70130

Received on ______________, 2018, and on ______________, 2018,

I served a true copy of the within ______________________________,

on ______________________________ in person,

at domicile with ______________________________

in ______________ Parish, a distance of ________ miles from the Justice Center.

______________________________
Deputy Sheriff

Parish of ______________________________

101-30 day Long Arm Service Citation
Rev 7/16